[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case telegraphs a cautionary note to unwary obligors, custodial parents, attorneys, support enforcement officers and the court itself, of the folly of unquestioningly accepting computer-generated numbers. It also illustrates an alarming lack of accountability by the bureaucracy in administering large sums of support money. In this case, the court is required to unravel years of erroneous computations, mistaken assumptions and conflicting records.
Among the errors built into this case were: (1) the failure of the support enforcement division to adjust its records to reflect a court-ordered modification of the support order; (2) the erroneous continuation of the charging of the current support order after the child reached majority; (3) the erroneous treatment of the plaintiff mother as deceased; (4) the failure of this court on at least two occasions to recognize glaring errors and inconsistencies in the record, and hence enter erroneous arrearage findings; (5) the failure of the Department of Social Services to suspend enforcement activity when it became obvious that the case was fraught with error; (6) the defendant's lack of diligence in sustaining his evidentiary burden with regard to support payments and flagging erroneous computations; (7) the inability of the Department of Social Services to produce clear, comprehensible records of this account; (8) the inclusion and intermingling of records of totally unrelated individuals with the records of this case; (9) improper alteration of support records to inject a purported arrearage to the State not found by the court, and (10) significant discrepancies between the purportedly identical records of payments maintained by the Department of Social Services versus those of the Support Enforcement Division. CT Page 17502
While the dimensions of the errors in this case are disconcerting, the court notes that the present players in this matter are, for the most part, not the individuals responsible for the errors. To the contrary, two representatives of the Department of Social Services, three support enforcement officers, Assistant Attorney General Rochelle Homelson, and defense counsel Attorney Leonard Shankman devoted a substantial amount of time and effort, under sometimes trying circumstances, to illuminate the matter and get the facts before the court. This court, in turn, has exhaustively reviewed the exhibits, the court record, and the transcripts in order to finally resolve this matter.
The "child" subject of this case, Tame Adams, is now a twenty-eight year old woman. She was born in Hartford on July 2, 1973. Less than two months later her mother, Faye Adams, executed an affirmation of paternity naming the defendant, Terry Allen as her father. Allen signed the acknowledgment of paternity on the same date, establishing legal parentage of the child pursuant to General Statutes § 52-442b [now General Statutes § 46b-172].
In September 1977, the State of Connecticut initiated a support petition against the defendant. The petition was filed with the then Court of Common Pleas at Hartford. A handwritten docket entry sheet records that an arrearage was found[1] and a support order of $30.00 per week was entered. Just one week later, the record shows a modification of the support order to $20.00 per week. The order was modified again in 1982 to $44.87 per week. The docket sheet mentions two more motions to modify in late 1982 and early 1983, but does not state the results of these motions. A third motion to modify resulted in the court, Noreen, J., "modifying" the order to $44.87 per week current support plus $5.00 per week on the arrearage[2].
In 1986 the defendant filed another motion to modify. The record indicates that the support order was modified "by agreement" to $35.00 per week support plus $5.00 per week on the arrearage. The court, Schimelman, J., approved the modification effective August 22, 1986 and found an arrearage of $989.30. Although the docket sheet does not specify, it is not disputed that the arrearage found was owed to the plaintiff[3]. The current support order was not thereafter modified. However, the State concedes that the support enforcement division never recognized this modification and continued charging $44.87 per week in its records.
In early 1987 the file was transferred from the geographical area court CT Page 17503 to the newly formed Family Support Magistrate Division of the Superior Court. A contempt citation was served on the defendant resulting in a hearing before the undersigned. The defendant failed to appear and a capias was ordered for his arrest. Subsequently, on June 17, 1987, the court, Buzaid, C.F.S.M., found an arrearage of $3,040.00 to the plaintiff and $1,983.94 to the State. A motion to modify by the defendant was denied by the undersigned in September 1987.
Thereafter, there was no activity recorded in the court file until March 1999, when the support enforcement division served a contempt citation on the defendant. On July 14, 1999, the court, Alvord, F.S.M., found an arrearage of $9,909.39 to the State of Connecticut and increased the arrearage payment order to $25.00 per week. On the next continuance date the court, Langley, F.S.M. found the defendant in compliance with the order, thus concluding proceedings under that contempt citation.
The court file was somnolent for another year. Meanwhile, the Department of Social Services, claiming authority under General Statutes § 52-362d (d) — (e), froze the defendants funds deposited with Solomon Smith Barney[4]. The Department commenced steps necessary to seize the assets of the defendant deposited in the account[5]. The defendant and the State have engaged in a prolonged administrative "fair hearing" pursuant to General Statutes § 17b-60 regarding the defendant's objections to the seizure and the amount claimed[6]. The hearing officer opted to suspend that hearing in deference to the present proceeding, which will adjudicate most of the same issues.
In September 2000 the defendant, by his counsel, filed a "Motion to Terminate the Order" (#108.00). At the initial hearing on this motion, on October 13, 2000, it became obvious that significant problems impacted the arrearage balance. Accordingly, the undersigned suspended enforcement of the order pending resolution of the issues. The defendant then filed a motion to open the judgment (#112.00), a second motion to open, an amended motion to open, a "motion to release lien and freeze, terminate the order, attorneys fees and interest" and a motion for accounting (#113.00). These motions were ultimately set down for special hearing, which was held over several days. Additional motions have been filed, including among them defendant's "motion for contempt and order for refund, accounting and partial attorneys fees" (#114.00); the State's "motion for arrearage determination and lump sum payment" (#119.00); and defendant's offer of judgment (#129.00) as well as numerous disclosure motions. The court issued a trial management order as a result of which counsel were able to file stipulations as to substantial underlying facts and agree on numerous exhibits. The remaining facts and evidence were brought forth in the contested hearing. CT Page 17504
 I MOTION TO OPEN JUDGMENTS
The motion to open the judgment was granted from the bench. The State conceded that notwithstanding the 1986 modification to $35.00 per week, the State continued to charge the defendant's account at $44.87 per week "right up until the child turned 18." Partial Transcript, 10/13/2000, p. 5. Furthermore, the purported arrearage findings of June 17, 1987 are mathematically impossible given the 1986 judgment. Even if the defendant made absolutely no payments during the forty-four week interval between the 1986 judgment and the 1987 finding the maximum arrearage would be $2,529.30[7]. The purported arrearage finding totals $5,023.94.
The specific judgments opened are the arrearage finding made on July 14, 1999 and the arrearage finding made on June 17, 1987. The motion was denied as to the judgment of August 13, 1986 which included an arrearage finding and any previous judgment. The 1986 and prior judgments were before the Family Support Magistrate Division was formulated. They were rendered by judges of the Superior Court and earlier, the Court of Common Pleas. This court does not have jurisdiction to open such judgments. Even if it did the absence of a record of the proceedings, paucity of evidence of the account and remoteness of time would constrain any inclination to revisit those judgments.
The State objected to the granting of the motion to open as to any of the prior judgments. While the State conceded errors in the arrearage findings, it argues that rather than open the judgements, the court should grant a motion to correct. However, a motion to correct usually applies to correcting a scrivener's error or other erroneous record of the court's actual judgment. That is not the case here. It was the actual judgment of the court, not merely the recordation of it that was erroneous.
The State also expresses concern that contempt findings and other ancillary orders would be nullified if the court were to open the judgments. This complaint is inapposite because the court is only opening the judgements as to arrearage findings. The court is not required and does not take the all or nothing approach that concerns the State. Moreover, the support orders were enforceable through contempt proceedings regardless of the outcome of any subsequent proceedings.Mulholland v. Mulholland, 229 Conn. 643, 652-54, 643 A.2d 246 (1994). CT Page 17505
The State also objects because the motion was filed considerably more than four months after the judgments. The provisions for opening any civil judgment, General Statutes § 52-212a and Practice Book §17-4 "allow a four month window from the date of judgment within which such a motion may be brought." In re Jonathan M., 255 Conn. 208, 237,764 A.2d 739 (2001).
Earlier cases held that courts lacked subject matter jurisdiction to open a judgment unless the motion was filed within four months. VanMecklenberg v. Pan American World Airways, Inc., 196 Conn. 517, 518,494 A.2d 549 (1985); Celanese Fiber v. Pic Yarns, Inc., 184 Conn. 461,465, 440 A.2d 159 (1981); Misinonile v. Misinonile, 190 Conn. 132, 134,459 A.2d 518 (1983); Handy v. Minwax Co., Inc., 46 Conn. App. 54, 56,698 A.2d 339 (1997); Ziruk v. Bedard, 45 Conn. App. 137, 139, 695 A.2d 4
(1997); Connecticut National Bank v. Oxenhandler, 30 Conn. App. 541,546-47, 621 A.2d 300, cert. denied, 225 Conn. 924, 625 A.2d 822 (1993). However, more recent law characterizes the statutory bar as "a limitation on the trial court's general authority to grant relief from a judgment. . . ." Yeong Gil Kim v. Magnotta, 249 Conn. 94,103, 733 A.2d 809 (1999).
"The court does have jurisdiction to open a stipulated judgment, on a motion, even after the four month period has elapsed if the movant can show that the judgment was obtained by fraud, duress, accident or mistake." Yeong Gil Kim v. Magnotta, 49 Conn. App. 203, 209, 714 A.2d 38, reversed on other grounds 249 Conn. 94, 733 A.2d 809 (1998); Solomon v.Keiser, 22 Conn. App. 424, 577 A.2d 1103 (1990); McDonnell v. McDonnell, Superior Court, judicial district of Hartford, doc. No. FA94-0535761 (February 2, 1999, Bishop, J.).
"Mistake is not readily susceptible of general definition. To the extent that a comprehensive definition of the term can be fashioned, it has been said that it signifies an erroneous mental conception which influences a person to act or to omit to act." Guaranty Bank Trust Co.v. Dowling, 4 Conn. App. 376, 379-80, 494 A.2d 1216, cert. denied,197 Conn. 808, 499 A.2d 58 (1985).
Mutual mistake has been held to exist where both parties are mutually mistaken about the same material fact. Buol Machine Co. v. Buckens,146 Conn. 639, 641, 153 A.2d 826 (1959); Dainty Rubbish service, Inc. v.Beacon Hill Association, Inc., 32 Conn. App. 530, 537, 630 A.2d 115
(1993); see also Harlach v. Metropolitan Property Liability Ins. Co.,221 Conn. 185, 190, 602 A.2d 1007 (1992). Yet in other instances, courts CT Page 17506 have held that although a party moving to open a judgment must "demonstrate that there is a good and compelling reason for the court to grant the motion . . ." the applicable statutes and practice rules ". . . [do] not contain a precise list of what the moving party must show in order to prevail. . . ." First Union National v. TDBInternational, 22 Conn.L.Rptr. 252 (1998).
Although a motion to open "is not to be granted readily, nor without strong reasons, it may and ought to be when there appears cause for which the court, acting reasonably would feel . . . bound in duty to do so."McCulloch v. Pittsburgh Plate Glass Co., 107 Conn. 164, 167, 140 A. 114
(1927); Wildman v. Wildman, 72 Conn. 262, 270, 44 A. 224 (1899). It is well recognized that the opening of a judgment is within the sound legal discretion of the court. Tyler v. Aspinwall, 73 Conn. 493, 497, 47 A. 755
(1901).
In this case, the court holds that the arrearage findings in 1987 and 1999 were the product of mutual mistake of the parties. The State erroneously charged the account at the previous higher support amount. It improperly tacked on a State arrearage not found by the Judge in the 1986 judgment[8]. It charged the account for current support beyond the child's age of majority. There is a potential significant discrepancy in the payment records as well. The support enforcement division in both its audits (Defendant's Exhibit 21 and State's Exhibit 39) credits the defendant with total payments of $5,589.38 from 1989 to the audit date. However, according to Camille Howell-Pinnock, a supervisor with the Department of Social Services, the defendant paid over $14,000. While some of these payments likely occurred prior to the 1986 judgment, the supervisor was unable to delineate how much of the total was paid before and after that key date. Transcript, 6/15/2001, pp. 42, 54, 64-66, 70-73.
The plaintiff and the defendant apparently relied on the accuracy of the State's computation. While it is true that the defendant could have exercised far more diligence by discovering the errors when they were made[9], or shortly thereafter, the court finds that in this particular case, the records in question were so difficult to follow that the defendant's shortcomings do not amount to laches, estoppel or waiver and should not preclude the court from exercising its discretion[10]. Instead, the records of this account are so fraught with errors and mistakes that it meets the threshold whereby the court feels duty bound to rectify the errors. CT Page 17507
 II CALCULATION OF ARREARAGES
The opening of the 1987 and 1999 arrearage findings essentially clears the decks back to the 1986 finding. Therefore, the starting point is Judge Schimelman's found arrearage of $989.30 as of August 8, 1986. Before actually recalculating the arrearages it might be helpful to enunciate the basic principals to be applied to this computation.
Generally, the defendant has the burden of proof of payment. Gatter v.Gatter, 15 S.M.D. ___, 2001 Ct. Sup. 1830-av (2001); Lynk v. Lynk, 11 S.M.D. 233, 242 (1997); Augustus v. Augustus, 2 S.M.D. 32, 33 (1988);Hacked v. Perry, 1 S.M.D. 102 (1987). This burden is usually met by producing documentary proof. Mish v. Mish, 14 S.M.D. ___ (2000); Link v.Link, 11 S.M.D. 233, 242 (1997); Eriksson v. Eriksson, 2 S.M.D. 91 (1988), Augustus v. Augustus, 2 S.M.D. 32, 33-34 (1988). However, it is up to this court, as the trier of fact, to determine the credibility of witnesses and the weight to be given to their testimony. Griffin v.Nationwide Moving Storage Co., 187 Conn. 405, 422, 446 A.2d 799
(1982); Riccio v. Abate, 176 Conn. 415, 418, 407 A.2d 1005 (1979); Raiav. Topehius, 165 Conn. 231, 235, 332 A.2d 93 (1973); Cook v. Bieluch,32 Conn. App. 537, 549, 629 A.2d 1175, cert. denied 228 Conn. 911,635 A.2d 1229 (1993); Cruz v. Kourpouanidis, 12 S.M.D. 38, 39 (1998);Hepburn v. Hepburn, 8 S.M.D. 126, 133 (1994); Fretina v. Fretina, 5 S.M.D. 139, 142 (1991). The court has the right to accept part and disregard part of the testimony of any witness. Barrila v. Blake,190 Conn. 631, 639, 461 A.2d 1375 (1983); Smith v. Smith, 183 Conn. 121,123, 438 A.2d 842 (1981); Rood v. Russo, 161 Conn. 1, 3, 283 A.2d 220
(1971); Lynk v. Lynk, 11 S.M.D. 233, 241 (1997); Carli v. Ruszala, 10 S.M.D. 320, 321 (1996); Tsirigotis v. Tsirigotis, 9 S.M.D. 152, 155 (19S5); Kimery v. Kimery, 9 S.M.D. 54, 56 (1995); Berluti v. Berluti, 5 S.M.D. 377, 382 (1991).
The support arrearage "accruing during the time of actual public assistance is awarded to the State, with all other arrearage accruing to the support recipient. This methodology was utilized by the court in allocating arrearages in Fear v. Fear, 12 S.M.D. 64 (1998); Correa v. Rosa, 10 S.M.D. 73, 76-77 (1996); Carniero v. Brevetti, 10 S.M.D. 65 (1996) (State failed to provide evidence of the amount of AFDC paid); Alicea v.Villafane, 10 S.M.D. 40 (1996) and McCulloch v. McCulloch, 6 S.M.D. 120 (1992)." McBride v. Singleton, 13 S.M.D. 284, 286, 2000 Ct. Sup. 693
(1999). CT Page 17508
"This is consistent with present Federal statutes and regulations. In 1996, the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), P.L. 104-193 and the Balanced Budget Act of 1997, P.L. 105-33
revised the Social Security Act to provide that ultimately support arrearages pursuant to an assignment of support are to be allocated and distributed in this manner. 42 U.S.C. § 408 (a)(3); 42 U.S.C. § 457 (a)(6). See also 45 C.F.R. § 302.32 (f) (ii);45 C.F.R. § 302.51 (a)(1). Section 17-578(b)-2 (b) of the Regulations of Connecticut State Agencies provides that on discontinuance of public assistance `current support payments shall be distributed to the custodial relative of record on the date of discontinuance, for the benefit of the children named in the child support order.'"[11] Busanetv. Plantier; 13 S.M.D. 290, 295 (1999); McBride v. Singleton, supra, 13 S.M.D. 286.
"The present arrearage can be computed by simply adding all charges under the operative support order, and subtracting all proper payments and credits." Gatter v. Gatter, 15 S.M.D. ___, 2001 Ct. Sup. 1830-av
(2001); Giordano v. Giordano, 14 S.M.D. ___ (2000); Filiatrault v.Becotte, 12 S.M.D. 154, 156 (1998); Lynk v. Lynk, 11 S.M.D. 233, 242 (1997); Thibault v. Thibault, 10 S.M.D. 313, 317 (1996); Alicea v.Villafane, 10 S.M.D. 40, 42 (1996); Landon v. Landon, 8 S.M.D. 200, 202 (1994).
The defendant has claimed throughout this proceeding that he has paid far more support than shown on the records of the support enforcement division. He has provided no proof of such additional payments. He was given ample opportunity to provide such evidence. One of the hearing dates was even adjusted in consideration of his work schedule so that he could attend and bring his evidence of the claimed additional payments. Yet the defendant did not attend that hearing, leaving his attorney with an argument but no evidence. Normally, in view of the defendant having the burden of proof, that would be the end of the discussion. In the present case, however, the irregularities in the State's records simply cannot be overlooked. The court is left with calculating the arrearage from what exists of the court record and what it finds credible and accurate from the conflicting records of the support enforcement division and the Department of Social Services.
The support enforcement division submitted two audits. They are similar except for conflicting amounts listed as State arrears as of the date of Judge Schimelman's finding. As has been previously determined, Judge Schimelman found no arrearage to the State. Accordingly neither amount is CT Page 17509 includable in the arrearage. Both audits agree that the amount owed to the plaintiff is $1,934.30. Both audits misstate the findings of Chief Family Support Magistrate Buzaid on June 17, 1987[12]. Since the audits included the unfound state claim, the total charges accruing to the State are incorrect in both audits[13].
The statement of assistance proffered by the Department of Social Services (State's Exhibit 42) does not purport to list the periodic charges of the support order. Rather, it purports to show all cash public assistance paid to the plaintiff on behalf of Tarrine. It is not determinative of the arrearage. Thibault v. Thibault, 10 S.M.D. 313 (1996)[14], It should be noted that the total amount of public assistance dating back to 1973 is substantial. However, this is not an issue in this case. While the total AFDC amount may be recoverable by the State pursuant to General Statutes § 17b-93[15] as a civil debt[16], it is not includable in the support arrearage.
Where the statement of assistance is helpful is to corroborate the support enforcement audit in its allocation between charges accruing to the State versus those accruing to the plaintiff. It is uncontroverted that at the time of Judge Schimelman's judgment, the plaintiff was not on public assistance. Hence the child support accrued to her. The support enforcement audit accrues the support to her through February 25, 1987 and after that, accrues all charges until Tame's majority to the State. However, the statement of assistance reveals conflicting data in three time periods. First, the statement of assistance shows the date of the first AFDC payment to Faye Adams as May 11, 1987, some ten weeks later than support enforcement. Second, the statement of assistance clearly shows a break in AFDC payments from January 1, 1989 until August 1, 1989, a period of 31 weeks during which only one $35.00 payment was made to the plaintiff. Third, the records show the last AFDC payment was made May 16, 1991. Assuming that this payment was intended to cover to the end of the month, that still leaves five weeks of support until Tarrine's birthday on July 3 which accrues to the plaintiff, not the State.
Combining the court record, the applicable portions of the support enforcement audit and adjusting based on the three additional non-assistance periods illuminated in the statement of assistance, the court can now calculate the correct child support charges. Charges accruing to the plaintiff are: CT Page 17510
 Arrears found by the court as of 8/8/86 $ 989.30 8/22/86 to 5/10/87 35 wks x $35 1,225.00 1/1/89 to 7/31/89 less 1 wk 30 wks x $35 1,050.00 6/1/91 to 7/3/91 5 wks x $35 175.00 TOTAL CHARGES — PLAINTIFF $3,439.30
One of the few areas of consistency and agreement in the records and testimony is that all of the support and arrearage payments after the 1986 judgment were applied to the State account. No payments were forwarded to the plaintiff during this time for either current support or against her arrearage. Therefore, the court finds the arrearage to the plaintiff, Faye Adams, to be $3,439.30 as of November 17, 2000.
As to charges accruing to the State, the period of time subject to the support assignment is May 11, 1987 through May 31, 1991 less the approximately seven months in 1989 during which only one $35.00 payment was made. Charges accruing to the State are:
 5/11/87 to 12/31/88 86 wks x $35 $3,010.00 Week of 3/1/89 35.00 8/1/89 to 5/31/91 96 wks x $35 3,360.00 TOTAL CHARGES — STATE $6,405.00
The testimony and the records of both agencies concur that all support collected after August 8, 1986 went to the State. Since July 1, 1987, support payment records in Connecticut are recorded in a computer program known as CCSES. The system is owned and maintained by the Department of Social Services but is also utilized by the Support Enforcement Division. One would expect, therefore, that payment records for the same case reported by each agency would be identical. Alas, in this case they are not.
Although the ultimate totals logged by each agency are nearly the same, the details differ significantly. The payment history according to the support enforcement division is reported on a so-called payment audit form which is included in exhibit 39. It purports to track each payment made by Mr. Allen including such information as the payment date, disbursement date, payee and even the check number. The record purports to cover all payments from January 1, 1985 through December 13, 2000 in reverse chronological order.
The payment records of the Department of Social Services are somewhat more difficult to read, as was evidenced by the difficulty of their own CT Page 17511 witness in interpreting the data. The records are included in the multi-page computer print-out attached to the statement of assistance (exhibit 42). Payments subsequent to August 1, 1986 are shown in a section subtitled "List Recovery Pints to Select Recips for Period 1974-current." This document lists only the month and year of payment, the payor and the payee. Those payments after August 1, 1989 are listed in reverse chronological order, providing the date, amount and payor.
The records of the two agencies agree that no payments were made for the balance of 1986 and the years 1987, 1988 and 1991. They are also in agreement on the payments made in calendar 2000. The court studied the individual payments listed to determine whether the same payment may have been recorded on different dates in the two lists. In so doing, it was possible to reconcile the numbers for several years[17]. The parties stipulated at trial to the 1999 to 2000 total which coincides with the support enforcement totals, so the court finds those year's figures to be correct. In 1994 the support enforcement audit contains a mathematical error. The actual recorded payments add up to nearly the Department of Social Services figure, so the court finds that amount correct. In the remaining years, the court found any payment listed on either record to be admitted by the State and therefore credited to the defendant.
The following table summarizes the yearly payments shown by each agency with the court finding on the far right:
 Year Payments per Payments per Court Finding:
Support Enforcement Department of Social Amount Credited
Division Services
 1986 0 0 0
1987 0 0 0
1988 0 0 0
1989 $225.00 0 $225.00
1990 0 $225.00 0
1991 0 0 0
1992 0 $287.93 $287.93
1993 $537.79 $82.50 $537.79
1994 $749.00 $782.03 $782.03
1995 $635.00 $635.00 $635.00
1996 $1,090.79 $1,175.79 $1,175.79
1997 $730.00 $1,005.00 $1,005.00
1998 $326.52 $371.52 $371.52
1999 $644.75 $319.75 $644.75
2000 $650.00 $650.00 $650.00
TOTAL $5,588.85 $5,534.52 $6,314.81
CT Page 17512
Thus in summary, charges to the State total $6,405.00 with payments credited against that total of $6,314.81. The total arrearage to the State is $90.19 as of November 17, 2000. The arrearage to the plaintiff[18] as previously computed, is $3,439.30. The court orders the defendant to make a $1,000.00 lump sum payment to the support enforcement division on or before January 31, 2002. It is to be disbursed first to extinguish the remaining State balance with the rest to be disbursed to the plaintiff. Thereafter, the defendant is to resume $25.00 per week arrearage payments until the plaintiffs arrearage balance is paid in full. Immediate income withholding is ordered.
 III RELEASE OF LIEN AND FREEZE
The court will next address a number of motions raising collateral issues. The first is the defendant's "motion to release lien and freeze, terminate the order, attorneys fees and interest". The court will first address the "lien and freeze" portion of this order. The other relief requested in this motion will be addressed elsewhere as they are raised in whole or in part by other motions.
In the factual summary at the beginning of this decision the court noted the levy of a freeze on the defendant's investment account instigated by the Department of Social Services. Steps were initiated to lead to an eventual seizure of the defendant's account. This procedure raises significant issues including but not limited to accountability, separation of powers, and due process. These important issues will at some point require judicial resolution. However, for reasons hereinafter stated the court regards them as moot for this particular case.
"A money judgment may be enforced against any property of the judgment debtor. . . ." General Statutes § 52-350f[19]; Doe v. Heintz,204 Conn. 17, 32, 526 A.2d 1318 (1987); New Haven Trolley and BusEmployees Credit Union v. Hill, 145 Conn. 332, 336, 142 A.2d 730 (1958). "Money judgement" is an order of decree of the court calling in whole or in part for the payment of a sum of money . . . [and] includes . . . in IV-D cases, over due support in the amount of five hundred dollars or more accruing after the entry of an initial family support judgment." General Statutes § 52-350a (13)[20]. "[T]he Superior Court has subject matter jurisdiction over the issuance of executions on a judgment of the Superior Court." Fenton v. Connecticut Hospital Assn. Workers'CT Page 17513Compensation Trust, 58 Conn. App. 45, 50, 752 A.2d 65 (2000); General Statutes § 52-350d[21]; see also Harris v. Harris, 14 Conn. App. 384,540 A.2d 1079 (1988). A judgment, order or decree of a family support magistrate is includable within the definition of a family support judgment. General Statutes § 52-350a (7)[22]. It is troubling to this court that the testimony of the Department of Social Services supervisor suggests[23] that the Department claims the authority to invoke the postjudgment lien and execution process independently and without reference or accountability to the court[24]. It is also disconcerting that the process provides for a resort to a "fair hearing" which sets up a potential conflicting determination to that by the court[25].
Under the particular circumstances of this case, however, a resolution exists short of a constitutional confrontation. First, although easily overlooked, there was a final court judgment that provided a basis for a postjudgment execution. The arrearage finding in July, 1999 of $9,909.39 to the State of Connecticut, was at the time, a final money judgment of over $500. Although that judgment was subsequently reopened, until that happened, there was a presumption of validity. See Mulholland v.Mulholland, 229 Conn. 643, 643 A.2d 246 (1994). Therefore, postjudgment execution was authorized under both General Statutes § 52-350f and § 52-362d.
The same statutory scheme that provided a basis for the execution under the 1999 judgment now compels the court to grant the defendant's motion and order the lien — or "freeze" — to be released. Both statutes contain limiting factors: there must be a money judgment and there must be "overdue support" of at least $500. Although the court has reopened the 1999 and 1987 judgments, it is replacing them with a new money judgment. Therefore, that condition is met. However, the new arrearage to the State is under $500. It is true that the court also finds an arrearage due to the plaintiff which exceeds $500. However, in view of the fact that neither the plaintiff nor either agency took any action to enforce any payment to the plaintiff since at least 1986, and that the agencies essentially wiped any arrearage to the plaintiff off the books and even assumed that the plaintiff was deceased, it can not now fault the defendant as being "overdue" on this support. The court specifically finds, therefore, that the arrearage owed to the plaintiff is not delinquent or overdue[26]. Since the statutory preconditions no longer apply, the court orders the lien or "freeze" released forthwith. CT Page 17514
 IV CONTEMPT AGAINST THE STATE
The defendant, by written motion (#14.00) and by oral motion, asked the court to hold the State in contempt of court. Here again the court need not embark in a constitutional analysis. There is a simple answer. Some of the actions or omissions of the State in this case may have been negligent, frustrating, in excess of the particular agency's authority, erroneous, malfeasant, or even unlawful. They do not, however, evoke a contempt of court because none of these actions were violative of a specific court order, General Statutes § 51-34, evidence behavior contemptuous of the court, General Statutes § 51-33, or violate the dignity or authority of the court so as to obstruct the administration of justice, General Statutes § 51-33a. Nor has the defendant proven that the actions or omissions of the State were wilful. Eldridge v. Eldridge,244 Conn. 523, 529, 710 A.2d 757 (1998); Connolly v. Connolly,191 Conn. 468, 483, 464 A.2d 837 (1983).
The defendant, in his brief, suggests that a "private person who does not comply with a court order can be found in contempt." This is undoubtedly true. He also claims that the "State admits that it did not respond properly to counsel and continued to carry a wrong arrearage." This is also undoubtedly true. Making a mistake, and being rude to counsel, or even, as here, exhibiting some proclivity to stonewalling and stubbornness, do not constitute wilful violation of a court order. On the oral motion, the court so stated from the bench. The written motion suffers the same fate. It is denied.
 V OFFER OF JUDGMENT
The defendant filed an offer of judgment. The offer provided, inter alia, that the defendant would pay $2,612.81 to the State in full and final settlement of its arrearage claim with a judgment of $2,612.81 in favor of the defendant against the State, presumably to offset his claimed damages. In practical terms the offer was to split the balance of the frozen investment account with the State. The State declined.
The procedures governing offer of judgment are located in General Statutes §§ 52-192a through 52-195. This statutory scheme is clear and unambiguous as it expressly applies only in civil actions based on CT Page 17515 contract or seeking money damages. See General Statutes § 52-192a (a) (allowing a plaintiff to file an offer of judgment "[a]fter commencement of any civil action based upon contract or seeking the recovery of money damages"); General Statutes § 52-193 (allowing a defendant to file an offer of judgment "[i]n any action on contract, or seeking the recovery of money damages"). Thus, §§ 52-192a through 52-195 do not apply to all civil actions; rather, this statutory scheme only applies to actions on contract or for money damages. The present case, however, involves the enforcement of a child support obligation, not a claim based on a contract or for money damages.
Moreover, Practice Book §§ 17-11 and 17-14, which are located in the civil matters chapter, contain the same offer of judgment provisions as those found in §§ 52-192a and 52-193. Practice Book §§ 25-6, 25-23, 25-31, 25-38, 25-39, 25-48 and 25-54 specify rules of practice which are applicable in family matters cases but that are located outside the family matters chapter. Neither Practice Book § 17-11 nor Practice Book § 17-14 are listed in these sections. Therefore, they are not applicable in family matters cases.
The defendant failed to provide any case authority for utilization of the offer of judgment to resolve a child support arrearage dispute. Extensive research failed to uncover any Supreme, Appellate or Superior Court cases in which an offer of judgment was used in a family case. Accordingly, the court concludes that the provisions for offer of judgment are inapplicable to the present case.
 VI DAMAGES, ATTORNEY'S FEES AND COSTS
The defendant has filed at least three motions that implicate in one fashion or another an award of damages, costs and/or attorney's fees by the State. In fact, one might suspect that the defendant's strained attempts to persuade this court to find the State in contempt of court or to apply the offer of judgment statutes are veiled attempts to set up grounds for the defendant to claim attorney's fees among his claimed damages. There is good reason for this endeavor. According to his attorney's affidavit, the defendant has incurred $7,612.50 in attorney's fees to defend himself and correct the many errors in his account. If the sole issue was the reasonableness of the fee, based on its observation of the proceedings before it along with the reams of pleadings, briefs and exhibits filed the court would find such fees reasonable. CT Page 17516
The State, however, objects to the requests on grounds of sovereign immunity and the absence of statutory authority to grant the attorney's fees. The State poses sovereign immunity as its primary defense against the defendant's claims for damages, attorney's fees and costs. It is settled law in Connecticut that the State may not be sued without its consent. Doe v. Heintz, 204 Conn. 17, 526 A.2d 1318 (1987); Lecasse v.Burns, 214 Conn. 464, 572 A.2d 357 (1990); Lemoine v. McCann,40 Conn. App. 460, 673 A.2d 115 (1996). Any proper claim by the defendant can only be made before the Claims Commissioner. General Statutes §4-142; Krozswe v. Town of New Haven, 212 Conn. 415, 562 A.2d 1080 (1989) cert. denied, 493 U.S. 1036, 110 S.Ct. 757, 107 L.Ed.2d 774 (1990).
The defendant appears to suggest two reasons for a claim against the State. First, he argues that he actually overpaid his support and is therefore entitled to a refund by the State. In view of the testimony that he actually paid over $14,000 in support, it is not impossible that the defendant might have proven additional payments which could have entitled him to a refund. However, he never presented evidence of additional payments. Secondly, there is a claim sounding in tort alleging impropriety by the State in its handling of the entire matter. Obviously, neither claim gets by the sovereign immunity barrier. Even if they did, this court has no statutory authority to adjudicate a tort claim.
The claims for attorney's fees and costs may be seen in a slightly different light. "The rule undoubtedly is that the State cannot be made a party defendant to an action without its consent; but if the State itself invokes the jurisdiction of the court to secure affirmative relief, it subjects itself to any proper cross demand involved in the subject-matter of the action." Reilly v. State, 119 Conn. 217, 219, 175 A. 582 (1934). See also State v. Hartford Accident Indemnity Co., 136 Conn. 157, 160
n. 1, 70 A.2d 109 (1949) (same); Winchester v. Cox, 129 Conn. 106, 113;;Wilcox v. Moore, Superior Court, judicial district of New London at New London, Docket No. 528154 (April 14, 1998, Solomon, J.) (same);State v. Lex Associates, 15 Conn.L.Rptr. 611, 612, 1995 Ct. Sup. 14645
(DiPentima, J., 1995) () (same); Marshall v. Balfour, 14 S.M.D. ___ n. 12,2000 Ct. Sup. 9353 (July 30, 2000, Lifshitz, F.S.M.) (same). The State would be subject to defenses or cross-complaints; State v. Kilburn,81 Conn. 9, 12, 69 A. 1028 (1908);
Here, the State initiated the present action by filing the support petition, as well as several contempt citations. Although the present motion before the court was filed by the defendant, it is merely a continuation of the case originally initiated by the State. The State CT Page 17517 invoked the jurisdiction of the court by initiating this action and, thus, has subjected itself to any proper cross demand involved in the subject matter of the action. See Wilcox v. Moore, supra, Superior Court, Docket No. 528154 (finding that sovereign immunity did not bar the defendant's motion for payment because the State initiated the action against the defendant to collect support). Therefore, the court holds that the State has waived any sovereign immunity claim that it may have had as to attorney's fees and costs directly related to defending this action.
The court now must determine if there is a statutory basis to award attorney's fees or costs to the defendant. "It is well entrenched in our jurisprudence that Connecticut adheres to the American rule . . . Under the American rule, a party cannot recover attorneys' fees in the absence of statutory authority or a contractual provision." (Citation omitted.)Doe v. State, 216 Conn. 85, 106, 579 A.2d 37 (1990).[27] "[O]ur legislature has not chosen to repudiate the American rule, but rather has made specific provisions for attorneys' fees in selected cases." Id., 107.
There are several statutes that could serve as the basis for an award of attorney's fees in family cases. However, most of them are only applicable in contempt proceedings. See General Statutes §§ 46b-87;[28]46b-215 (a)(8)(C);[29] 52-256b (a);[30] 52-400c (1).[31] This real cause before the court is the defendant's motion to open, not a contempt citation. The defendant's attempts to persuade the court to recognize a contempt claim against the State were not successful. The previous contempt citations filed by the State against the defendant have been previously resolved. As such, the above-referenced statutes are not applicable in the present case.
The remaining statutes under which attorney's fees could be awarded in this case are General Statutes §§ 46b-62, 52-400c (2) and 52-400c
(3). Section 46b-62 allows the court to order a spouse or a parent to pay the reasonable attorney's fees of the other in certain family cases. Since the State is not a spouse or parent, this section provides no help to the defendant.
General Statutes § 52-400c (2) applies to discovery hearings. Although initially some recalcitrance was observed in discovery proceedings in this case, ultimately the parties complied with this court's trial management order. Therefore, there is no cause to sanction either party by ordering attorney's fees relative to discovery.
General Statutes § 400c (3) is available to a party after defending against a postjudgment procedure brought by the opposing party to harass CT Page 17518 or for the purposes of delay. This may be the closest provision to forming a basis for the defendant to make a claim. The only reported appellate level case does not clarify its applicability. It simply established the right of the moving party to an evidentiary hearing. NewEngland Savings Bank v. Clark, 54 Conn. App. 121, 734 A.2d 121 (1999). In that case, the motion was filed by the plaintiff which claimed that various post-judgment motions and an appeal were filed by the defendant solely to harass the plaintiff and delay execution on the judgment. Id., 123. In the present case, the actual proceeding adjudicated by the court were motions filed by the defendant. The postjudgment procedure utilized by the State was permitted as long as the 1999 judgment stood. Since there was color of law supporting the State's actions, they cannot be held to be solely for purposes of harassment or delay. Therefore, it does not appear that there is any statutory authority to award attorney's fees in this situation. "In the absence of legislative authority [our courts] have declined to permit any monetary award against the State or its officials." Fetterman v. The University of Connecticut, 192 Conn. 539,550, 473 A.2d 1176 (1984).
Lastly the court notes that General Statutes § 4-184a (b) provides authority for the court to award attorney's fees and costs against State agencies if the court determines the agency's actions were "undertaken without any substantial justification." However, this statute appears to apply only to administrative appeals taken to the Superior Court or beyond. Moreover, a quick review of cases reveals courts have been difficult to persuade that even relatively petulant conduct meets the statutory standard. Connecticut Association of Not-For-Profit Providersfor the Aging v. Department of Social Services, 244 Conn. 378, 401,709 A.2d 1116 (1998); Burinskas v. Department of Social Services,240 Conn. 141, 156, 691 A.2d 586 (1997).
A similar analysis applies to the defendant's claim for costs. The State argues general sovereign immunity. It also suggests that General Statutes § 46b-231 (n)(9) expressly prohibits the taxation of costs against the State. Section 46b-231 (n)(9), however, is only applicable when a family support magistrate decision is appealed to the Superior Court. Thus, this section does not preclude awarding costs against the State in this case.
Practice Book §§ 25-6, 25-23, 25-31, 25-38, 25-39, 25-48 and 25-54
specify rules of practice which are applicable in family matters cases but that are located outside the family matters chapter. Practice Book §18-5, which is located in the civil matters chapter, is applicable in family matter cases pursuant to Practice Book § 25-39; Thus, Practice CT Page 17519 Book § 18-5 is applicable in this case.
Practice Book § 18-5(a) provides in relevant part; "Costs may be taxed by the clerk in civil cases fourteen days after the filing of a written bill of costs provided that no objection is filed." Practice Book § 18-5(a) is clear and unambiguous as it expressly provides for the taxation of costs by the clerk. Quite simply then, costs are allowed in family matters cases. Arguably, since the State initially brought the action, the defendant may argue, it waived any immunity claim against costs.
There are several cases specifically addressing awards of costs against the State. The results are mixed. "Even where the monetary ward is so minimal as the sum a prevailing party would be entitled to receive as taxable costs under General Statutes § 52-237, this court has refused to sanction a monetary judgment against the State in the absence of explicit statutory authority." Doe v. Heintz, 204 Conn. 17, 32,526 A.2d 1318 (1987). "A statute giving a right to costs in general terms will not be construed to include an award against the State, because the State is invested with the immunities from legal process, mesne and final. . . ." State v. Chapman, 176 Conn. 362, 366, 407 A.2d 987 (1978) (general language of a statute authorizing costs not enough to impose costs against the State); State ex rel. Foote v. Bartholomew,111 Conn. 427, 432, 150 A. 308 (1930) (no costs taxable against the State in a mandamus action notwithstanding statutory provision allowing costs to enforce a private duty); State v. Anderson, 82 Conn. 392, 393-94,73 A. 751 (1909) (the bringing of a criminal information by the State does not imply consent to pay costs on an appeal).
There are, however, cases to the contrary. In State v. Crabtree,32 Conn. Sup. 322, 353 A.2d 796 (1975) the court recognized the State's sovereign immunity but found it waived. "If the institution of the suit seeking affirmative relief by the state waives its right not to be sued in a counterclaim and subjects it to damages, a fortiori it should also be considered to have waived its right to immunity from costs." Id. 324. Although not exactly on point, the court refused to dismiss a claim for interest against the State in State v. Lex Associates, supra,15 Conn.L.Rptr. 612 holding that by bringing the action, the State consented to the claim for interest. Although the award of interest was ultimately reversed by the Supreme Court on appeal, the reversal was based on interpretation of the relevant statute, General Statutes §37-3a. Neither the majority decision nor the dissenting opinion says a word about sovereign immunity in their discussion of the award of interest. State v. Lex Associates, 248 Conn. 612, 628-34, CT Page 17520730 A.2d 38 (1999).
In any event it is noted in passing that it is actually up to the clerk of the court to tax costs. Our courts have often disparaged attempts to avoid the practice rule and bring claims for costs directly to the court. Triangle Contractors, Inc. v. Young, 20 Conn. App. 218,222, 565 A.2d 262 (1989). Therefore, any claim for costs should be pursued through a bill of costs to be determined by the clerk of the court as provided in Practice Book § 18-5.
 VII RESCRIPT
The judgments of June 17, 1987 and July 14, 1999 are reopened for the arrearage finds only. The court finds that as of November 17, 2000 there is any arrearage to the plaintiff Faye Adams in the amount of $3439.30 and to the State of Connecticut in the amount of $90.19. The defendant is ordered to make a lump sum payment of $1,000.00 to the support enforcement division on or before January 31, 2002, to be disbursed first to pay off the State arrearage with the balance applying to the plaintiff's arrearage. The $25.00 per week arrearage payment is reinstated forthwith and secured by immediate income withholding.
The contempt motions against the State are denied, as are the motions for damages and attorney's fees. If the defendant intends to pursue costs, he must do so by filing a bill of costs to be determined by the clerk of the court pursuant to Practice Book § 18-5. Since the arrearage to the State is less than $500 and the arrearage to the plaintiff is found to be non-delinquent and not "overdue", the lien or freeze on the defendant's investment account is ordered released forthwith.
 BY THE COURT ___________________ Harris T. Lifshitz Family Support Magistrate